Whalet, Judge,
delivered the opinion of the court:
The plaintiff brings this action for damages for the breach of an express contract entered into on December IT, 1919, between plaintiff and the United States Shipping-Board Emergency Fleet Corporation, acting for and on behalf of the defendant, for the sale by the latter to the former of a large quantity of surplus iron and steel originally acquired for the purpose of building ships.
A summary of the facts is as follows: Throughout the year 1919 a division of the Emergency Fleet Corporation was located in Philadelphia, Pennsylvania, in charge of a Vice President, J. L. Ackerson. After the Armistice, the shipbuilding activities of the Fleet Corporation ’were sus *677 pended and most of its outstanding contracts for materials and construction were canceled. The result was that the Fleet Corporation was left with vast quantities of materials purchased for shipbuilding purposes which could not be used but had to be disposed of.
In July 1919 Congress passed an act granting to the President of the United States the power to dispose of this material. The President delegated his power to the Shipping Board and the Shipping Board delegated its power to the Emergency Fleet Corporation. As a matter of fact, the same disposition of surplus materials had been carried on by the Fleet Corporation for many months under its implied power prior to the President’s order.
In August 1919 John Barton Payne became President of the Emergency Fleet Corporation. Immediately after taking office President Payne ascertained that the surplus steel of the Fleet Corporation was being sold by the division presided over by Vice President Ackerson in Philadelphia.
Reports were made to him of the sales which were being made by this division. President Payne urged that the sales be expedited and criticized Vice President Ackerson for not making more vigorous efforts to sell the surplus material. On October 27, 1919, President Payne wrote Vice President Ackerson:
Emphasizing our discussion of Saturday, please make vigorous efforts: (a) To dispose of all materials we may have on hand at any point not absolutely necessary for shipbuilding; steel, lumber, machinery, house plants, wooden hulls, shipbuilding yards not being used — in short, everything. This is a good time to sell things, and I want it dealt with vigorously.
To this letter Vice President Ackerson wrote President Payne:
We are doing our utmost to dispose of any and all surplus material and equipment.
He stated in addition that sales in the hundreds of thousands of dollars had been made the previous week. The Fleet Corporation compiled an inventory of the surplus iron and steel, investigated market conditions, and consulted several of the leading steel companies. From this investigation *678 it arrived at fair values at which to sell the steel in large lots, and the material was listed and the lists distributed and advertised.
President Payne stated not alone to plaintiff but to other parties that Vice President Ackerson, who was in charge of the Supply and Sales Division in Philadelphia, had the selling of all the material of the Fleet Corporation.
In November 1919 Harris Brothers & Company entered into negotiations for the purchase of the fabricated and un-fabricated materials at the plant of the American Bridge Company and some large tonnage of material in supply warehouses and storage yards of the Emergency Fleet Corporation. During negotiations with Harris Brothers & Company for the purchase of this material, a form contract was prepared which was agreeable to both parties in the event of their getting together on the purchase price. During these negotiations President Payne was in constant touch with Vice President Ackerson and was kept fully informed as to all terms of the negotiations. Vice President Ackerson conferred with representatives of other steel companies with the object in view of obtaining better bids than that received from Harris Brothers & Company. Telegrams were sent to other prospective purchasers, and the bidding was postponed from time to time until December tenth. On that day, while other parties were in conference with Vice President Ackerson in Philadelphia, plaintiff’s representative called on President Payne in his office in Washington and stated that he was desirous of bidding on the sale of this material. President Payne informed plaintiff’s representative of the prices for which he believed the material could be .purchased and which the plaintiff would have to offer, and thereupon telephoned Vice President Ackerson of the proposed visit of plaintiff’s representative and, upon being informed by Vice President Ackerson that he was in conference with other parties for the sale of the material, stated that he would send someone over the next day who would make a higher bid. President Payne informed plaintiff’s representative that Vice President Ackerson had the material for sale and that he must go to Philadelphia and see the Vice President.
*679 The nest morning, December eleventh, Briggs, representing Briggs and Turivas, the plaintiff, appeared in-Ackerson’s office in Philadelphia. When he entered the office of the Fleet Corporation in Philadelphia on this-day he met J. Lee Allen, Assistant Manager of the Supply and Sales Division. Briggs stated to Allen that President Payne had sent him over to purchase the surplus material. Allen replied that the Fleet Corporation had had many negotiations for the sale of surplus material and that a form contract had been prepared which . would be used with anyone purchasing the material. This form contract,., which was handed to Briggs, was the same contract form which had been prepared in negotiations with Harris Brothers & Company. Allen gave a copy of this form contract to Briggs, who, after reading it, informed Allen that it was satisfactory. At the same time Allen also gave Briggs a mimeographed slip showing the quantities and locations of the surplus iron and steel and informed him that the purchaser would be required to deposit a check for $50,000 on. the acceptance of his bid and a check for $350,000 on the' signing of the form contract.
Allen then took Briggs into Ackerson’s office and Vice President Ackerson stated that he was expecting him as-President Payne had told him that he was sending him over. Briggs then told Ackerson what he understood would be the approximate prices of the steel and these prices were the-same as those stated to Briggs by President Payne. Acker-son then repeated to Briggs the terms previously outlined by Allen, namely, the form contract and the deposit of the check for $50,000 on the acceptance of the bid and the check: for $350,000 on the signing of the form contract. Vice President Ackerson was informed by Briggs that he had read the form contract and that it was satisfactory to him. Ackerson stated to Briggs that there had been many negotiations for the sale of the material and he was authorized by President Payne to proceed with the sale. There were present in Vice-President Ackerson’s office and remained there throughout the whole proceeding, besides the Vice President, H. H. Weaver, member of the General Cancellations, Claims, and Contracts Board, and J. E. Allen, Assistant Manager of the-. *680 Supply and Sales Division. The bidding between Briggs and another group then took place, one group stepping out while the other group came into President Ackerson’s office. After one group had bid against the other some dozen times, Briggs finally made a bid of $45.41 ($43.31 if not loaded) per gross ton on the unfabricated material and $22.65'i4 on the fabricated material. This was the highest bid submitted and Vice President Ackerson informed Briggs that he could have the material. Vice President Ackerson ordered his secretary to prepare a memorandum of sale, and, after it was prepared, Briggs filled in the prices in ink and signed it on behalf of the plaintiff. Vice President Acker-son thereupon called President Payne by telephone and advised him that Briggs and Turivas’ bid had been accepted and President Payne gave his approval and ratification of the sale. Vice President Ackerson then signed the memorandum of agreement as follows:
“Prices accepted sub]’, to drawing contract.
“J. L. AckersoN.”
Immediately after the execution of the memorandum agreement, Briggs gave Vice President Ackerson plaintiff’s check in the sum of $50,000 which was promptly forwarded to the bank in Chicago upon which it was drawn and caused to be certified on December 13, 1919. A few days thereafter Briggs delivered to Vice President Ackerson plaintiff’s check in the sum of $350,000. At the time of the delivery of the latter check, and previous thereto, Briggs went to thc-Vice President’s office and stated that he was there for the purpose of signing the form contract and was told each time that it was not yet ready.
During the week following December eleventh there was a very rapid rise in the price of steel, an average increase of five dollars a ton, and on ship plate a rise of ten dollars a ton. About this time Harris Brothers & Company, who were one of the bidders for this material, communicated with President Payne claiming to have purchased the steel from an employee of the Fleet Corporation who was with the Supply and Sales Division under Ackerson. They stated that if President Payne would offer the material for resale they would make a higher bid than that for which it had been *681 sold to plaintiff. Plaintiff, having learned that certain unsuccessful bidders were trying to interfere, had its counsel, J. Hamilton Lewis, send a telegram to President Payne protesting against any interference with the contract made with plaintiff. President Payne, under date of December 15th, caused plaintiff and others to be notified by telegram that another sale of the steel would be held in his office in Washington on December 18th. The morning before the sale took place J. Hamilton Lewis called on President Payne and stated to him that the plaintiff had a binding contract and protested against a resale of the steel. When President Payne opened the meeting for the sale of the steel J. Hamilton Lewis again protested on behalf of plaintiff and at the end of the bidding made a further protest. Without waiving the above protest plaintiff bid up to its price which it had contracted to pay on December 11th. The Barde Steel Products Company was the highest bidder at this sale and was awarded the contract. No part of this steel was ever delivered to plaintiff. The market price continued to rise in 1920 and remained very much higher than plaintiff’s contract price.
Although the facts are voluminous, we feel it is necessary to make the above extended summary in order that the issues may clearly appear.
The defendant has presented several defenses, some have very properly been abandoned and really only two are forcibly urged. The authority of the Vice President to make a sale of the material is the issue most seriously presented.
It is unnecessary to go into the delegation of the power to the Emergency Fleet Corporation for the parties have stipulated that the “sale and disposition of the iron and steel hereinafter mentioned were, prior to December 11,1919, duly delegated by said President and said Board to said corporation and so .continued throughout the period in which took place the transactions herein stated.” The Fleet Corporation had full power to dispose of the material i-n this suit. The Corporation can only act through its officers and they can only bind the Corporation within the powers delegated to them by the Corporation. Did the Fleet Corpora *682 tion authorize its Vice President with power to bind it through his actions in the sale of the surplus material ?
In our opinion, the Vice President possessed the authority to make a sale of this material and to bind the corporation in more than one delegation of power. In the first instance, the authority to dispose of the surplus material was specifically conferred upon him by the then President of the Corporation, who acquiesced in his prior sales of material when reports were received from the Vice President. The President sent parties to him to purchase the material, reproved him for not making quick sales; informed this plaintiff, among others, that the sales were being made by the Vice President, sent them to the Vice President, telephoned him not to make a sale until they arrived, and, upon being informed that plaintiff had made the highest bid, ratified and approved the acceptance of the bid. It is not questioned that the President had the power to bind the corporation in a sale of its surplus material. His actions above detailed can convey only the firm conviction that he recognized and acquiesced in the sales by the Vice President. However, it is not necessary to rely solely on the delegation of authority to sell derived from Judge Payne, who was then the President of the Corporation. The records of the Fleet Corporation clearly show such powers were conferred on the Vice President.
A division of the Fleet Corporation was located in Philadelphia and Vice President Ackerson was in charge. All material for the building of ships was purchased by this division, and it was the surplus material which was for sale.
The Fleet Corporation by-laws in Section 3, Article III provide:
SectioN 3. The Vice Presidents shall perform such duties as may be assigned or delegated to them by the President, including the power to sign contracts and other instruments.
In April 1919 the President of the Corporation specially delegated to Vice President Ackerson the power to make contracts and this delegation was subsequently approved by the Board of Trustees. The authority of the Vice Presi *683 dent to bind the corporation by contracts was in effect during the entire year of 1919 and was not taken away from Vice President Ackerson until 1920. The transactions under review happened in the last month of 1919.
The defendant contends that Ackerson filled the position of Vice President and also that of Director General and in the latter capacity he had limited his actions by the requirement that, before a sale could be made, the approval of a Board must be had.
It is apparent that in this instance, if not in all others, Ackerson was acting in the official capacity of Vice President and not that of Director General. The office of Director General had previously been abolished. President Payne sent the plaintiff to the Vice President and the offer of the plaintiff was addressed to the Vice President and accepted by him in that capacity. But, admitting for the sake of argument that Ackerson was acting as Director General, we are of the opinion that the sale made by him met with all the requirements delegated by him to the Board. A very brief review of the authority of this Board will amply confirm our view. The position of Director General of the Emergency Fleet Corporation existed and on January 15, 1919, the Board of Trustees authorized the Director General to settle canceled contracts and dispose of surplus material and if the loss to the United States in any claim should exceed $25,000, the Director General should have the concurrence of one other person to be named by him and approved by the Board of Trustees. On May 5, 1919, the powers of the Director General were transferred to Vice President Ackerson so that thereafter Ackerson had the duties which he formerly had as Vice President, as well as the duties of Director General. Vice President Acker-son then created a “Sales Beview Board” to act with him in regard to sales of material where the original cost exceeded $5,000, and appears ultimately to have designated it as the “one other person” mentioned in the Board’s resolution of January 15, 1919. This Board was approved by the Executive Committee. Subsequently, this Board was abolished by Ackerson and its duties conferred upon the *684 “Cancellation, Claims, and Contracts Board.” It was provided that the approval of sales could be given by this Board in one of three ways, viz.:
1. By actual consideration of negotiated sales of agreement.
2. By sanctioning in advance the proposed detail of a sale transaction which if consummated in accordance with advance rulings is considered approved by the Board in advance.
3. By approving for issue minimum price lists whereby all sales at prices not lower than the minimum price quoted are approved automatically.
In September Ackerson changed the name of the Board to “General Cancellations, Claims, and Contracts Board.”
During the negotiations with Harris Brothers & Company the prices offered by these parties had been approved and a form contract prepared and approved by the Board in a formal resolution. A member of the Board was present when the bids were received and was present when the bid of plaintiff was accepted. The prices accepted were higher than the bid made by Harris Brothers & Company which had already been approved by the General Cancellations, Claims, and Contracts Board; therefore the bid of a price more than the minimum price approved by the Board did not require further action by the Board. It complied with “all sales at prices not lower than the minimum quoted are automatically approved.”
From the whole record it is also apparent that in making this sale to the plaintiff Ackerson carried out the procedure which had been established for the disposition of the surplus material. The form contract containing the proposed “detail of sales transaction” and the minimum prices of the material had both been approved by the General Cancellations, Claims, and Contracts Board. We do not think there is any merit in this contention.
We have shown that Ackerson had power to sell as Vice President, as Director General, and also from the express authority given him by President Payne and the approval and confirmation of the sale by the President.
The contention is made that, even if Ackerson had power to make the sale of the surplus material, the memorandum of *685 sale executed by him does not constitute a binding contract for the reason that the form contract was never signed. The formal contract is not the agreement of the parties but only the evidence of that agreement. It is simply “an additional wheel in the machinery.” The legal question for determination is whether the document which was signed contained all the elements of a binding contract between the parties. It has been held too often to need the citation of authorities that if the memorandum or letters signed by the parties contain the elements of a contract, although the signing of a formal contract is contemplated but is never executed, the parties are bound. Garfielde v. United States, 93 U. S. 242; American Smelting Co. v. United States, 259 U. S. 75; United States v. Purcell Envelope Co., 249 U. S. 313.
All the elements of a contract are present in the memorandum. The Government offered ior sale the surplus material and bids were received. The subject matter was known from the lists furnished by the Government to the bidders before the bids were made. The offer by the plaintiff was accepted by the defendant and the payment of $50,000 by the plaintiff was accepted by the defendant as part of the purchase price. The consideration was the giving of the check and certification of it by the bank on which it was drawn. It was the equivalent of the passing of that amount of money in cash from the plaintiff to the credit of the! defendant. The subject matter was well known to each party and the terms of the proposed form agreement had been accepted. It is significant that the word “drawing” and not “making” was used by the Vice President when accepting the offer of the plaintiff. The Vice President knew the plaintiff had been given a copy of the form contract, had been informed it would have to agree to its terms if it were awarded a contract and he was fully cognizant that the plaintiff had accepted the terms of the form contract. All that remained to be done in drawing the final contract was to fill in the parties and prices to the sale. The details of the final contract had already been fixed. There was a complete meeting of the minds on every detail. The plaintiff performed all the conditions required of it and even *686 made the second payment of $350,000 which was accepted. The v plaintiff repeatedly offered to execute the formal contract.
The setting aside of the sale to plaintiff and the resale of the surplus material to another party was an arbitrary and capricious act on the part of President Payne which constituted a clear breach of contract. Its seeming justification of enrichment to the Government at the expense of the plaintiff is totally without legal sanction. In our opinion, the memorandum of sale was a binding contract on the Government and its subsequent failure to live up to its terms constituted a breach for which the plaintiff is entitled to damages.
Having found the plaintiff is entitled to damages for a breach of contract, there is left for our decision only the compensation to be awarded.
The Supreme Court has laid down the rule for the breach of an executory contract of sale in the case of United States v. Burton Coal Company, 273 U. S. 337, as follows:
The applicable measure of damages is fixed by the rule of law that, where a buyer in violation of an execu-tory contract ox sale refuses to accept the commodity sold, the seller may recover the difference between the contract price and the market value at the times when and the places where deliveries should have been made. 2 Williston on Sales, § 582. * * * The, difference between that value and the contract price is the amount of damage deemed by the law directly and naturally to result in the ordinary course of events from the appellant’s breach of contract.
The measure of damages the plaintiff is entitled to have is the difference between the contract prices and the market prices at the times when and places where the steel was delivered to other parties. This difference we find to be $2,778,333.
The plaintiff is entitled to a judgment for this sum. It is so ordered.
Williams, Judge; LittletoN, Judge; Green, Judge; and Booth, Chief Justice, concur.